MARK S. ADAMS, SB#68300
ANDREW F. ADAMS, SB#275109
California Receivership Group
2716 Ocean Park Boulevard, Suite 3010
Santa Monica, CA 90405
Tel.: (310) 471-8181
Fax: (310) 471-8180
madams@calreceivers.com
Court-Appointed Receiver

# IN THE UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SANTA ROSA DIVISION

| | |
|---|---|
| IN RE:<br><br>FLOYD E. SQUIRES, III and<br>BETTY J. SQUIRES,<br><br>          Debtors. | Case No: 17-10828 WJL<br>Chapter 11<br><br>**MARK S. ADAMS AND CALIFORNIA RECEIVERSHIP GROUP'S RESPONSE TO DEBTORS' CLAIM OBJECTION; DECLARATION OF MARK ADAMS**<br><br><u>Hearing</u>:<br>Date: June 27, 2018<br>Time: 10:30 a.m.<br>Courtroom 220, Oakland<br><br>Hon. William J. Lafferty |

///

///

///

///

///

///

///

///

///

///

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

# TABLE OF CONTENTS

**TITLE**                                                                 **PAGE**

I.      INTRODUCTION…………………………………………  1

II.     STATEMENT OF FACTS AND HISTORY OF CRG'S

        INTEREST……………….…………………………………..  2

III.    THE DEED OF TRUST AUTHORIZES COLLECTION OF

        ALL FEES……………………………………………………  4

IV.     CALIFORNIA LAW REQUIRES PAYMENT OF THE

        FEES……………………………………………...………..  7

V.      11 U.S.C. § 506(b) ……..………………………………….  9

VI.     THE FEES ARE PROPER, REASONABLE, AND

        NECESSARY ……………………………..………………  11

  A.      POST-FEE ORDER STATE COURT FEES……………...  12

  B.      POST-FEE ORDER BANKRUPTCY COURT FEES……  14

  C.      HOURLY RATES ARE REASONABLE………………...  15

  D.      TOTAL AMOUNTS ARE REASONABLE………………  17

  E.      PUBLIC POLICY REQUIRES THAT DEBTORS PAY

          THE FULL AMOUNT…………………………………….  19

VII.    CONCLUSION …………………………………………...  19

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

# TABLE OF AUTHORITIES

## CASES

| TITLE | PAGE |
|---|---|
| Andrade v. Andrade (1932) 216 Cal. 108, 110-11…………………….. | 8 |
| Baldwin v. Baldwin (1947) 82 Cal. App. 2d 851, 854, 856…………. | 8 |
| Camacho v. Bridgeport Financial, Inc., 523 F.3d 973(9th Cir. 2008)…. | 16 |
| Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028 (9th Cir.2000), at 982…………………………………………………….. | 16 |
| City of Chula Vista v. Gutierrez (2012) 207 Cal.App.4th 681, 685…… | 7 |
| City of Eureka v. Floyd Squires et al., Case# DR110040…………….. | 2 |
| City of Riverside v. Horspool (2014) 223 Cal.App.4th 670, 685……… | 8 |
| City of Santa Monica v. Gonzalez (2008) 43 Cal.4th 905, 934……….. | 8 |
| Ferland v. Conrad Credit Corp., 244 F.3d 1145 (9th Cir.2001), at 978. | 16 |
| Floyd E. Squires, et al. v. Mark Adams, et al., Case# DR110803…….. | 2 |
| In re Dalessio, 74 B.R. 721, 724 (9th Cir. BAP 1987)………………… | 10 |
| In re Elmwood Farm, Inc., 19 B.R. 338, 341-42 (Bankr. S.D.N.Y. 1982)……………………………………………………………………… | 10 |
| In re Merkle, 575 B.R. 704, 710–11 (Bankr. W.D. Tex. 2017)……….. | 10 |
| In re O'Bannon Plaza LLC, 523 B.R. 720, 727 (D. Nev. 2014)………. | 10, 11 |
| In re Parreira, 464 B.R. 410, 415–16 (Bankr. E.D. Cal. 2012)……….. | 10 |
| Southern California Sunbelt Developers, Inc. v. Banyan Limited Partnership (2017) 8 Cal.App.5th 734, 737, 910, 927…………………. | 8, 9 |
| People v. Riverside Univ. (1973) 35 Cal.App.3d 572, 587……………. | 8 |
| Macmorris Sales Corp. v. Kozak (1967) 249 Cal.App.2d 998, 1005….. | 8 |
| McLane v. Placerville & S.V.R. Co. (1885) 66 Cal. 606, 623……….. | 8 |
| Melikian v. Aquila, Ltd. (1998) 63 Cal.App.4th 1364, 1368……….... | 8 |
| Takeba v. Superior Court (1919) 43 Cal.App. 469, 475………………. | 7 |

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

Venza v. Venza (1951) 101 Cal.App.2d 678, 680……………………    8

## **STATUTES**

**TITLE**                                                          **PAGE**

6 Witkin, Cal. Proc. 5th (2008) Prov. Rem, § 459, p. 389……………..  8

11 U.S.C. §506(b)……………………………………………………  9, 10

55 California Jurisprudence 3d., Receivers §82, §84…………………  8

California Rules of Court Rule 3.1179…............................................  7

Clark on Receivers (3rd ed. 1959), § 637.1, subds. (a)-(r), pp. 1055-
68……………………………………………………………………  9

Miller and Starr, 12 Cal. Real Est. § 41:2, 22 (4th ed.)……………....  8

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

**EXHIBIT LIST**

| | |
|---|---|
| Exhibit 1 | Debtors' May 4, 2018 Objection to Claim |
| Exhibit 2 | March 10, 2011 Appointment Order |
| Exhibit 3 | October 24, 2011 Appointment Order |
| Exhibit 4 | February 21, 2017 Ruling and Order Re Request for Interim Fees |
| Exhibit 5 | October 30, 2017 Notice of Trustee's Sale |
| Exhibit 6 | February 27, 2017 Receiver's Certificate No. 2 |
| Exhibit 7 | February 27, 2017 Amendment to Deed of Trust |
| Exhibit 8 | October 17, 1961 Fictitious Deed of Trust |
| Exhibit 9 | January 21, 2014 Receiver's Certificate No. 1 |
| Exhibit 10 | January 21, 2014 Deed of Trust |
| Exhibit 11 | August 10, 2016 Motion for Interim Fee Order |
| Exhibit 12 | September 6, 2016 Opposition to Motion for Interim Fee Order |
| Exhibit 13 | September 9, 2016 Reply to Opposition to Motion for Interim Fee Order |
| Exhibit 14 | September 2016 to December 2016 Invoices |
| Exhibit 15 | January 2017 to December 2017 Invoices |
| Exhibit 16 | January 2018 to May 8, 2018 Invoices |
| Exhibit 17 | Excel Spreadsheet Showing Fees by Employee by Month |
| Exhibit 18 | Excel Spreadsheet Showing Fees by Employee by Year |
| Exhibit 19 | CRG Billing Rates |

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

# I. **INTRODUCTION**

On March 5, 2018 the Receiver filed Claim No. 57 (Dkt. 274) requesting that Debtors pay the Receiver a total debt of $319,248, of which $178,248[1] was secured and $141,000 was unsecured. On May 4, 2018, Debtors filed an Objection to Claim No. 57 (Dkt. 274) ("Objection") (attached as **Exhibit 1**), objecting only to the then $141,000 in unsecured fees and costs. The Objection claims that the as-of-yet unsecured fees and costs are not properly documented or detailed, and as discussed, this Response is to provide documentation for the unsecured fees and costs, and the legal authority calling for them to be paid.[2] The secured amount is now over $187,801 due to accrued interest[3], and the unsecured amount is now $162,169 due to the additional fees and costs that have been incurred since the Receiver's Claim. Thus, the total amount of the claim is now nearly $350,000. These amounts are fully explained and summarized below and in the Declaration of Mark Adams.

Usually, these receivership fees and costs would be reviewed and approved by the appointing state court, but because of the bifurcated nature of this matter and the concurrent jurisdiction of both courts, the amount owed to Adams as the former receiver is submitted to the present Court to be ruled on under this Court's jurisdiction. As laid out below, general principles of equity, as well as both state and federal law call for the recovery of the Receiver's costs as well as the costs associated with the collection efforts, and the Receiver respectfully requests that this Court follow Judge Reinholtsen's previous directives, and ensure that Adams and CRG are paid for the time this case required.

# II. **STATEMENT OF FACTS AND HISTORY OF CRG'S INTEREST**

The fees and costs at issue were first incurred after a March 10, 2011 Appointment Order issued by Judge Dale Reinholtsen in the Humboldt Superior Court, *City of Eureka v. Floyd*

---

[1] This was the $158,107.36 total for the February 21, 2017 Order, along with the interests as of the date of the Proof of Claim.

[2] Demands for these billing records were served three days after the Objection, and so the relevant information will be provided to Debtor in response to those demands as well.

[3] The payoff for this depends on whether the February 27, 2017 Receiver's Certificate #2 is paid – which is drawing 15% interest by its terms, or whether the Judgment itself is paid, which is drawing the 10% statutory interest.

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

_Squires et al._, Case #DR110040 (attached as **Exhibit 2**), appointing Mark Adams of California Receivership Group ("CRG") as Receiver for 26 properties owned by Debtors Floyd and Betty Squires ("Debtors") due to numerous health and safety code violations that were so extreme as to necessitate the appointment of a receiver. That Order was stayed on appeal, and then an October 24, 2011 more limited Appointment Order was issued (attached as **Exhibit 3**), and that too was stayed on appeal. On October 19, 2011, Debtors then served and filed a Summons and Complaint in the Humboldt Superior Court for various tort claims, including trespass and invasion of privacy, naming Mark Adams, Andrew Adams and California Receivership Group, LLC ("Collectively Adams") as defendants. The matter _Floyd E. Squires, et al. v. Mark Adams, et al._, Case# DR110803 went to jury trial on July 18, 2016, and on the 22nd, the jury found for Adams and CRG on all claims.

On August 10, 2016, Adams filed a Motion for Interim Fee Order in the Receivership case #DR110040, requesting $223,715.39 in fees and costs incurred both from Adams's duties as receiver, but also for legal fees incurred defending against the rejected claims that went to trial, specifically for fees and costs through July 31, 2016. The hearing was held on September 9, 2016, and on February 21, 2017, the Superior Court issued an Order authorizing $158,107.36 in fees and costs (attached as **Exhibit 4**). That amount was the secured debt referenced in Claim #57. Debtor has made no effort to pay those amounts, and has not responded to any of the requests for payment, or even any of the Abstracts of Judgment, or the Receiver's Certificate recorded per the terms of that Order. On July 28, 2017, Adams filed a Motion requesting the appointment of a receiver to collect on that debt, which was denied without prejudice by the Superior Court on November 15, 2017.

A foreclosure sale on the Receiver's Certificate and its Deed of Trust had been set for November 27, 2017 (attached as **Exhibit 5**). Yet, the Bankruptcy Petition was filed in this Court on November 8, 2017, starting the current matter, and ultimately stalling the foreclosure and other collection efforts. Adams and CRG's participation in this matter has been limited to

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

defending its claim and interest in the Property, by supporting the request to appoint a Chapter 11 Trustee, and then the currently-in-place Examiner.

As noted previously, the State Court's February 21, 2017 Order approved CRG's interim fees through July 31, 2016, which is the already-secured portion. The Receiver's Claim and this present Response requests both that secured amount as well as fees that were incurred after that period, from August 1, 2016 through May 18, 2018, which have not yet been reduced to a secured interest in the Properties. Attached as exhibits to the accompanying Declaration of Mark Adams are the invoices for all CRG time from that subsequent period. These are the exact same invoices that were submitted to Judge Reinholtsen and approved for the most part for payment in February 2017. They track time to the 1/10 of an hour. Every minute of billed time can be tracked through those invoices, which will be summarized and totaled here.

Also attached as **Exhibit 17 and 18** are Excel spreadsheets showing the total fees of each CRG employee, broken down by month and year. These are provided for review along with the below analysis and summarization. The total amount owed for all billed time, costs, advances, etc. from August 1, 2016 – May 18, 2018 is $162,169. The time for all state court work (September 2016 – October 2017) is $63,738.50. The time for all work done in this bankruptcy proceeding (November 2017 – May 2018) is $98,430.50.[4] The breakdown of these pre-Petition fees and post-Petition fees is relatively clean and simple due to the timing, and the fact that neither action was active during at the same time. Those amounts and their explanations are below in Section V.

### III. THE DEED OF TRUST AUTHORIZES COLLECTION OF ALL FEES

As a preliminary matter, the February 27, 2017 Receiver's Certificate ("Certificate") (attached as **Exhibit 6**) authorized by the February 21, 2017 fee Order is secured by a February 27, 2017 Amendment to Deed of Trust ("DOT") (attached as **Exhibit 7**) that itself incorporates the approval of the fees and costs. That DOT incorporates by reference the provisions (1) to (14),

---

[4] Debtors filed their bankruptcy petition on November 8, 2017. For ease of review, and because the amount billed in the first week of November were de minimis, the entire month of November is attributed to the bankruptcy action.

inclusive, of the Fictitious Deed of Trust ("FDOT") recorded in Humboldt County on October 23, 1961, in book 657 on page 527-528 (attached as **Exhibit 8**).[5] Provisions (3) and (10) specifically cover attorney's fees. This is the standard recovery provision for any fees and costs that have to be spent to protect the Beneficiary's interest, made relevant particularly in this matter as to the smaller portion of fees incurred post-Petition in defending the very existence of the Certificate. As this Court will remember, CRG has had to repeatedly correct misstatements made here challenging the validity or finality of its DOT and total amount owed. CRG is defending the existence of the DOT itself in this matter.

Provision (3) provides:

To Protect the Security of This Deed of Trust, Trustor Agrees: (3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

Here, Adams has been required to appear in several actions to protect the security of this interest. Although the DOT is secured by 26 properties, which would seem to indicate that the properties adequately secured the interest, the Debtor's filings indicated that their liabilities equaled their assets, jeopardizing the security. For instance, in Debtor's first Monthly Operating Report for the month ending November 30, 2017 (Docket No. 80, Jan. 18, 2018), Debtors claimed to have $16,695,000.00 in total assets and the exact same amount of $16,695,000.00 in total liabilities. Thus, while Adams has a priority Certificate above all other non-tax debt, the repeated challenges to that Certificate and the apparent lack of equity in the estate required Adams to appear and protect the security of that Certificate and DOT.

And most important to the review of this authority, Debtors routinely disputed the validity and the existence of CRG's interest. In Debtor's Declaration in Support of the Cash Collateral Motion (Docket No. 144, March 5, 2018), Debtors attempted to frame CRG's

---

[5] Copies of the Amendment to DOT and the FDOT are attached as Exhibits 6 and 7, to the Declaration of Mark Adams.

4

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

Judgment and Certificate on the 26 properties as somehow still in dispute, or not yet final. In doing this, the Declaration contained misstatements and outright lies, including:

- The properties are "purported to be encumbered" by a deed of trust. Paragraph 4, line 6.
- "At no time did the Court authorize Mr. Adams or the California Receivership Group to encumber the properties." Paragraph 5, lines 19-20.
- The "purportedly assigned compensation amount" and the "purported beneficiaries" Paragraph 7, lines 3-4
- "Mr. Adams contends" that the Certificate is senior to the Deeds of Trust, "however, there is no order of subordination and no recorded subordination…." Paragraph 8, lines 10-14

These misrepresentations had to be raised for review and are raised again now. And that was not the only time that they tried to sneak in language that would attempt to invalidate the debt. As far back as the November 30, 2017, in Docket No. 22, Debtor Floyd Squires states (under penalty of perjury):

- That the receivership properties "are purported to be encumbered" by CRG. Paragraph 4, line 16
- "I did not authorize the execution of the said Deed of Trust and find no authority of the Court given to Mr. Adams to execute said Deed of Trust." Paragraph 4, lines 21-23
- "At no time did the Court authorize Mr. Adams or the California Receivership Group to encumber the properties." Paragraph 5, lines 4-5
- The beneficiaries of the Certificate and DOT became "purported beneficiaries" and the total owed was the "purportedly assigned compensation amount." Paragraph 7, lines 16-17

The claim that the State Court did not authorize the Certificate encumbering the Property is a bold-faced lie, and these statements amount to an underhanded attempt to delegitimize the State Court's authority and trick the parties in this matter. The February 21, 2017 Order does just that on page 4 of the Order, authorizing a priority Receiver's Certificate. **Exhibit 4**. Yet Debtor tells this Court multiple times the exact opposite. It is not a simple mistake, or something he just forgot – this is a lie meant to deceive. This has forced Adams to make great efforts to defend the hard-fought fee award authorized by the State Court, including Adams' December 7, 2017 Opposition to the Cash Collateral Motion, Docket No. 34. Put simply, without Adams' participation and answering these misrepresentations, Debtors may have gotten away with

simply ignoring the Receiver's interest. It is hard to imagine a role more basic and central to a deed of trust than defending its very existence in this Court. There is no more a threat to the security of the DOT than the Property owner perjuring himself before this Court to try and negate the DOT.

Beyond the existential threat that Debtors posed, due to Debtors' assertions that the liabilities equaled the assets and Debtors' assertions that the security interest was not valid, it was necessary for CRG to participate throughout this bankruptcy process to protect its security interest, including both of CRG's Oppositions to Debtors' Cash Collateral Motions (Docket No. 34, December 7, 2017; and Docket No. 147, March 7, 2018), CRG's Opposition to Motion for Order Excusing Turnover by Custodian (Docket No. 51, December 20, 2017), and CRG's Opposition to Employ Special Counsel Bradford C. Floyd (Docket No. 85, January 24, 2018), and CRG's letter to the UST (February 8, 2018), informing them of CRG's concerns of Debtor's unreasonable spending and inconsistent financial reporting, among others.

Provision (10) of the FDOT provides "To Protect the Security of This Deed of Trust, Trustor Agrees:

> (10) That as <u>additional</u> security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, **in his own name sue** for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, **including reasonable attorney's fees**, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice. (emphasis added.)

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

While CRG did not take possession of the 26 properties and collect rents and profits, as it could have under the FDOT, this provision, combined with provision (3), makes it clear that reasonable attorney's fees are allowed under the FDOT in any action required to protect its interest.

Debtors repeatedly challenged the very existence of the Certificate and DOT, and attempted to undermine them as "purported" or temporary. These were not inchoate judgments, nor were they easily come by in the state court. The terms were clear, but the Debtors tried to tell this Court otherwise. Debtors were threatening the security of the DOT and Certificate, and so all fees incurred to protect Adams' interest are owed under the FDOT.

## IV.   CALIFORNIA LAW REQUIRES PAYMENT OF THE FEES

In addition to the authority in the DOT requiring the payment of the fees spent in defending the existence of and collecting on the order and Certificate, California law calls for paying the fees incurred in collection. This is the legal basis upon which the State Court had twice previously authorized the payment of Adams' fees. A receiver is an independent third party, a "hand" or "agent" of the court that acts only upon the direction and authority of the appointing court. Takeba v. Superior Court (1919) 43 Cal.App. 469, 475; California Rules of Court, rule 3.1179. And the default rule for all Receiver's fees and costs (even those incurred in defending actions taken, or even when those actions might not have directly benefitted the estate) is that the receivership property pays. That is why Judge Reinholtsen approved the interim fee orders, and authorized a priority Certificate to be funded.

California law is clear that a receiver like Adams is to be paid for work in the state court and in bankruptcy court. A receiver is entitled to payment of his own fees and costs, and the fees of all agents in his employ. City of Chula Vista v. Gutierrez (2012) 207 Cal.App.4th 681, 685, citing Venza v. Venza (1951) 101 Cal.App.2d 678, 680.[6] The amount of that compensation is generally (though not always) left up to the appointing Court because the appointing court obviously knows the need for the appointment and is familiar with the day-to-day activities

---

[6] See also City of Santa Monica v. Gonzalez (2008) 43 Cal.4th 905, 934, People v. Riverside Univ. (1973) 35 Cal.App.3d 572, 587, Macmorris Sales Corp. v. Kozak (1967) 249 Cal.App.2d 998, 1005, Baldwin v. Baldwin (1947) 82 Cal.App.2d 851, 856.

therein. Id. 680-81. This concept was affirmed as recently as 2014 in City of Riverside v. Horspool (2014) 223 Cal.App.4th 670, 685 and 2017 in Southern California Sunbelt Developers, Inc. v. Banyan Limited Partnership (2017) 8 Cal.App.5th 910, 927. Commentators are unanimous that when a neutral third party is appointed for real property, that the expenses incurred in the furtherance of the appointment order must be recompensed.[7]

This goes for costs of defending the actions of a receiver as well. 55 California Jurisprudence 3d., Receivers §84. See Melikian v. Aquila, Ltd. (1998) 63 Cal.App.4th 1364, 1368 (receiver recovering litigation costs of defending receivership actions); Baldwin v. Baldwin (1947) 82 Cal. App. 2d 851, 854; Andrade v. Andrade (1932) 216 Cal. 108, 110-11 (property pays its own costs of rehabilitation). "That he should be allowed costs of litigation, is equally clear. Expenses in taking care of, protecting, and repairing the property in the receiver's charge, should also be allowed. This is so well established by decided cases, that we consider it only necessary to cite some of them." McLane v. Placerville & S.V.R. Co. (1885) 66 Cal. 606, 623 (citations omitted).[8]

Southern California Sunbelt Developers, Inc. v. Banyan Limited Partnership (2017) 8 Cal.App.5th 910, 927 summed it up as "[t]here are many factors a trial court should consider when determining whether the obligation to pay for the receivership should be the estate or be shifted to one or more of the parties." There, the court of appeal was clear that the receiver's fees are to be set at discharge, but can be apportioned amongst the parties as needed at a later date. Id. at 734, 737. That case, like the others before it, started with the premise that receivership fees and costs are to be paid – the main question for the reviewing courts is who is to pay them. Banyan Limited made it clear that the Court can decide when best to apportion or shift liability for the receiver's fees and costs, but that those fees and costs have to be paid.

---

[7] Miller & Starr, 12 Cal. Real Est. § 41:22 (4th ed.); 55 Cal. Jur. 3d Receivers § 82; 6 Witkin, Cal. Proc. 5th (2008) Prov. Rem, § 459, p. 389.

[8] See also People v. Riverside University (1973) 35 Cal.App.3d 572, 587 where the receivership fees, as well as the cost of defending against an "unfounded" challenge were to be paid by the receivership property itself; Macmorris Sales v. Kozak (1967) 249 Cal.App.2d 998, 1005.

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

And while there are 2014 and 2017 reaffirmations of the concept that the receivership estate pays the receiver and receiver's legal fees (or the owner directly if the estate is insufficient), that is not a new concept. "The expenses of the receivership and the receiver's fees and those of his counsel in ordinary cases must come out of the property or funds placed in the custody of the receiver according to a rule analogous to the rule providing that a trustee's expenses and fees for services should come out of the property in the hands of the trustee." 2 Clark on Receivers (3rd ed. 1959), § 637.1, subds. (a)-(r), pp. 1055-68.

In this matter, Judge Reinholtsen already approved the same exact type of fees and costs put to this Court now based on the California case authority cited above. Using the exact same type of invoices, and the exact legal argument as above, Judge Reinholtsen granted the fees and costs (except pre-appointment fees) and ordered the Debtors to pay that. These were not just receivership fees, these were spent in defending against ridiculous tort claims, and the years of discovery that Debtors put Adams and CRG through. Those defense costs had to be paid, just like the cost of defending and enforcing that previous order has to be paid now.

## V. 11 U.S.C. § 506(b) CALLS FOR PAYMENT OF FEES

Separate from the DOT authority, and the California law cited above, 11 U.S.C. §506(b) also separately approves the payment of the fees and costs at issue. As recently as the April 25, 2018 hearing, Debtor's counsel stated that there was more than enough equity in the properties that he intends to sell to pay off the claims against the estate. This indicates that CRG is an over-secured creditor and 11 U.S.C. § 506(b) governs recovery of both interest and attorney's fees for an over-secured creditor:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

11 U.S.C. § 506(b). It is becoming clearer to the parties and to this Court (certainly to the Examiner) that the estimates of value were over-inflated, and so this case might not be one with an equity. But to take the Debtor at their word, means that Adams is an oversecured creditor.

There are four basic requirements for allowance of fees, costs or charges to a secured creditor: (1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be over-secured; (3) the entitlement to fees [costs or charges] must be provided for under some agreement or state statute; and (4) the fees [costs or charges] sought must be reasonable. In re Merkle, 575 B.R. 704, 710–11 (Bankr. W.D. Tex. 2017).

Here, CRG's claim is a secured claim based on the DOT. The extent to which is it is allowed is to be determined by the court reviewing this Claim Objection, and Response. Second, CRG's Claim is over-secured. CRG seeks $319,248.00, and its Claim is secured by 26 properties, in first position. Debtor's counsel has indicated that there is more than $319,248.00 in equity in the 26 properties listed in the DOT. Third, CRG is entitled to reasonable fees and costs incurred to protect its security interest, as per the DOT and the FDOT, as detailed in section II, supra. And fourth, the fees, costs, and charges are reasonable, as will be shown below. There is ample evidence for this Court to use its "broad discretion" in setting the fees to approve them in their entirety. In re Parreira, 464 B.R. 410, 415–16 (Bankr. E.D. Cal. 2012) (citing In re Dalessio, 74 B.R. 721, 724 (9th Cir. BAP 1987).

That discretion relies on the reasonableness of the Claim,[9] set by the Court's evaluation of whether the fees at issue were for reasonable actions that another similarly situated creditor might have taken. In re O'Bannon Plaza LLC, 523 B.R. 720, 727 (D. Nev. 2014). "The question is whether, 'considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interests in the debtor's property.' Id. In O'Bannon Plaza, the court noted that the creditor "incurred fees protecting its interest in the property in response to Debtor's misleading disclosure statement, and in response to a proposed plan of reorganization that scheduled payments to [creditor] over ten years and

---

[9] See In re Elmwood Farm, Inc., 19 B.R. 338, 341-42 (Bankr. S.D.N.Y. 1982)

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

potentially created an artificially impaired class to allow for confirmation over [creditor]'s objection." Id. at 728.

Here, like in O'Bannon Plaza, CRG has participated in the bankruptcy solely to protect its interest, and only in the capacity to point out misleading disclosures and declarations from the Debtors. Debtors claimed that their liabilities equaled their assets, possibly rendering CRG's interests extinguished. Moreover, Debtors tried to convince this court that Adams' claim was not yet settled or somehow invalid. These issues presented an existential threat to CRG's interest, and CRG had no choice but to participate to protect its security interest. If Debtors' filed documents are to be believed, there is ample equity, meaning that Adams is oversecured and can collect on his fees and costs incurred in protecting his interest.

## VI.    THE FEES ARE PROPER, REASONABLE, AND NECESSARY

As noted previously, the Debtors' Objection is only to the unsecured fees and costs incurred after the July 31, 2016 cut-off date for the State Court's February 21, 2017 fee order. The total amount of fees, costs, advances, etc. incurred since then, from August 1, 2016 – May 18, 2018, is $162,169 (August 2016 fees were billed in September, thus they show up as September 2016 billings). The amount for all state court work (September 2016 – October 2017) is $63,738.50. The amount for all work done in this bankruptcy proceeding (November 2017 – May 2018) is $98,430.50. Every single invoice substantiating that amount has been provided as Exhibits to the accompanying Declaration of Mark Adams.[10]  As explained above and in the subsections below, these fees and costs were entirely proper, reasonable, and necessary, and both law and equity require that Debtors pay the full amount.

### A. POST-FEE ORDER STATE COURT FEES

All time billed starting from August 1, 2016 until the Petition was filed in this Court on November 8, 2017 is attributable to the state court action. Debtor might have had some

---

[10] The August 10, 2016 state court fee Motion (attached as **Exhibit 11**) broke down the amounts in a similar fashion. It laid out the $150,606.49 billed by CRG in that receivership and the defense, and the $47,937.65 in advances. The fees and invoices for the $35,171.25 for outside local trial counsel. The exact same information and presentation is put to this Court in this Response and Declaration.

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

preparation work for the bankruptcy, but for obvious reasons, CRG did not. So, it should be uncontroversial to acknowledge that the 14 months of billing from September 2016-October 2017 are attributable entirely to the state court action. The total incurred during that period is $63,738.50, which will be broken down and analyzed below.

First, this Court must remember that like everything else in this matter, collecting on Judge Reinholtsen's Order was not (and is not) easy. The Order was dated February 21, 2017 and to this very day, Debtor has never once reached out or responded to inquiries as to how it will be paid. The Order was not appealed, yet Debtor attempted to ignore it. Adams and CRG had to prepare and file an Abstract, and evaluate all options including local counsel to collect.

Ultimately, after the Order was not appealed, and six months had passed, Adams had to prepare and file a complex, 134-page Motion requesting the appointment of a Receiver. This proposed receiver, unlike the Receiver appointed at that time, would have financial control over the Properties and could pay off the debts with rents. This proposed replacement receiver would be more than just a monitor, or someone working at the behest of the Debtors; rather, this receiver would do the work necessary and pay for that work (along with the debts) with the rental and sale proceeds. The idea was that the replacement receiver would be similar to the Examiner here. Ultimately that request was denied without prejudice on November 14, 2017, but the same principle was ultimately reached with the current Examiner. Obviously the appointment authority and the roles are different, but the concept and the underlying reasons for the role are the same. A neutral, third party had to be appointed to wrestle control over the nuisance properties, and assess how best to proceed.

The $63,738.50 incurred during that period is summarized here and detailed in the invoices attached to Adams' Declaration. The months ranged from $185[11]-$10,447[12], and that variation was due to the wide range in the amount of work required in any given month. The most active months were in completing and arguing the fee motion in October 2016, and then

---

[11] For time billed in October 2016, when the fee motion was pending with the Court and no real action was taken by CRG.

[12] For the September 2017 billing, referencing August's time. That was the motion to appoint a receiver to collect on the Order that the Debtor was refusing to pay.

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

again across several months in 2017, peaking at $10,447 in September 2017. That month was when the motion to appoint a (new) receiver to collect on the judgment that Debtors refused to pay was briefed and argued. That was when the bulk of the actual enforcement work was necessary, and all of the billed time was spent with the sole purpose of collecting on the interim fee order.

Debtors might object to that billed time, but the simple fact that the interim fee order is now 15 months old and Debtors still have not even discussed paying it tells this Court all it needs to know. Debtors fought tooth and nail, and even now, with an appointed Examiner here, they still are demanding briefing and voluminous discovery before they will allow it to be paid. Debtors are not in possession and will not write the check to CRG, but at the same time are forcing Adams and CRG to spend dozens of hours of work just to collect. They propounded discovery, which will not be answered until after everyone expected a sale to close, and long after they filed their Objection to the Claim. So the discovery is not meant to gather information (any relevant information will already be put to the Court in advance of a sale), it was meant just to burden and slow down collection. If discovery was actually necessary, Debtors would have demanded it long ago. So, even with a neutral third party acting as the Examiner, the Debtors are doing everything they can to sabotage and delay payment. That's why Adams has had to stay involved.

The work described in the attached invoices is almost entirely the cost of attempting to collect on an Order that Debtors refused to pay and took every step to avoid paying. The three major spikes in those fees were for the motion to collect the fees, the motion to appoint a new receiver, and then preparations for a foreclosure because none of the other methods were productive. By comparison, the fees for those 14 months that total $63,738.50 ($4,553/month) are not too far off from the fees for the approximately 65 preceding months, which totaled $223,715.39 ($3,441/month). That was the requested amount that the State Court approved in part in its February 21, 2017 Order. The slightly higher monthly average in the 14 months is

more than reasonable especially when considering the timing of the trial, and this Court's relatively quick resolution of the relevant issues.

## B. POST-FEE ORDER BANKRUPTCY COURT FEES

Following the Debtors' Petition with this Court on November 8, 2018, the total fees incurred for the interim period (November 2017 – May 2018) is $98,430.50. As with the fees incurred for the state court action, the fees incurred for this bankruptcy proceeding are backed up and explained by the invoices provided as Exhibits to Mark Adams' Declaration and are further summarized below. Again, while the appointing Court would be in a better position to know the role of Adams and the value of his participation, because of the timing issues, this demand must now be reviewed by this Court. And separate from the DOT language and the requirements that the fees be paid, both California law and Bankruptcy laws require paying the fees incurred in this bankruptcy.

This Court will remember that Adams engaged in the Debtors' cash collateral motions quite successfully, which resulted in the acceptance of CRG's position – namely that rental income be used liberally to preserve the properties and upgrade the dangerous, nuisance conditions thereon. And as noted above, these were motions and declarations that lied to the Court about the status of the Certificate and DOT. Adams had to make extensive efforts to correct those false self-serving statements and to set the record straight. Monitoring the Debtor was/is necessary, as the City recently made clear with a tenant "paying" the estate in all cash (whether this matter was picked up in the M.O.R. is not known). Debtor also lost one of the properties to arson months before the Petition, after which a sex-for-rent exchange went badly. Obviously, this Debtor has to be monitored, and parties with an interest in the estate cannot ignore this proceeding.

The biggest month for billings in this matter was April 2018, which was the billed time for March. And much of that was the $10,150 for Mark Adams. In reviewing Invoice #23162 for Mark Adams, the Court can review the 99 entries spread over 8 pages. Only one of those entries is over an hour, and that was for preparing for and attending the March 8, 2018 hearing. The rest

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

of the entries are for communications and preparations on the potential trustee appointment, the property manager appointment etc. And part of that work was in determining how best to involve and participate with the property manager, Examiner, the City, and the Debtor. Clearly, the most expensive billing party within CRG is motivated only to keep his finger on this proceeding's pulse, not to waste or bill unnecessary time.

The fees incurred during this bankruptcy period are entirely reasonable, in light of the major filings and hearings for this matter. As noted above in section III, Adams had to repeatedly defend his interest and the Certificate. He had to respond to (now two) separate 2004 demands and prepare the Proof of Claim along with the explanation of that claim. He had to repeatedly assert his position supporting the spending of funds on the violations, while protecting his own interest. Navigating this matter has not been simple and it has required close supervision. Adams has had to spend time on the phone with all parties, and make himself available for approximately 15 hearings. And while he did not appear in person to participate in the March 26, 2018 Chapter 11 Trustee trial/mediation, he did have to prepare for that and participate via phone. All of these filings and appearances were to defend the very existence of CRG's hard-fought debt that the state court approved. The Debtor had the gall to attempt to delegitimize the state court's order in this Court, and so of course there were expenses in defending that.

### C. HOURLY RATES ARE REASONABLE

Already the appointing state court has found the fees and the rates reasonable. In the February 21, 2017 Ruling, Judge Reinholtsen (noting the lack of opposition) "finds the hourly rates requested by Mark Adams and Andrew Adams are reasonable hourly rates." Ruling, page 3, line 23-24. As envisioned by the Court on April 25, 2018, CRG's hourly fee rates are provided in this Response and the attached Declaration. Under the well-established lodestar method of awarding fees, the reviewing court must take into account the prevailing market hourly rate in awarding fees. Camacho v. Bridgeport Financial, Inc., 523 F.3d 973(9th Cir. 2008). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Camacho, citing Ferland v. Conrad

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

Credit Corp., 244 F.3d 1145 (9th Cir.2001), at 978. While the reviewing court may adjust the fees as it deems appropriate, for instance by deducting a certain percentage of the fees, it must first calculate an award of fees by calculating the 'lodestar' before departing from it. Camacho, citing Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028 (9th Cir.2000), at 982. This also notably applies to fees incurred as a result of pursuing or defending those fees. Camacho, at 982-983.

All of CRG's employees and independent contractors bill their time separately. Attached as **Exhibit 19** is the rate sheet of all of CRG's employees and independent contractors. As explained below, all of those rates are either below or consistent with market rates.

**Mark Adams** – Mark has been an attorney for over 40 years, and holds a law degree from Georgetown Law School. Other receivers with those credentials and experience levels bill at $600+, thus Adams' rate of $350/hour is reasonable.[13] Adams' involvement in this matter, as laid out in his Declaration, was to protect the interest created by the February 21, 2017 Order, and he spent 147.68 hours on this matter since August 1, 2016.

**Andrew Adams** – Andrew is an eighth-year attorney, and has worked for CRG since passing the bar in 2010. He was educated at UC Berkeley and USD Law, and bills at $330/hour. For the post-fee order period between August 1, 2016 – May 18, 2018, Andrew Adams spent approximately 156 hours on this matter in this Court and the state court.

**Hayden Adams** – Hayden Adams (no relation) is a new attorney who has worked for CRG since passing the Bar in 2017. For the post-fee order period between August 1, 2016 – May 18, 2018, Hayden Adams spent 95 hours at $225/hour.

**Other employees and independent contractors** – CRG's other employees and independent contractors work at rates lower than that of Mark Adams and Andrew Adams, and their rates are likewise either lower than or consistent with market rates. For the post-fee order period between August 1, 2016 – May 18, 2018, all other CRG employees and independent contractors were responsible only for $37,749.50 of the billings, or 23% of the billings. Mark,

---

[13] Mark Adams' fees have risen to $450/hour, but the $350/hour continues to be billed for this case, because that was what Judge Reinholtsen approved in 2011, and then again in the 2017 interim fee order.

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

Hayden and Andrew Adams were responsible for the other 77%, with the bulk of the non-lawyer billed time coming from paralegals preparing the filings. Clearly, the time was limited to only that which was essential to defend the claim in this proceeding.

The above hourly rates and the number of hours worked are arguably less than what would be reasonable, as this case has required substantial expertise in both real estate law and litigation generally. This Court does not need a reminder of how complex and needlessly litigious this case has become. The fees incurred in this matter have been kept relatively low, despite the variety of hearings, motions and negotiations that this case has required, by keeping the work at the lowest possible billing rates, and appearing only when absolutely necessary.

Generally, all legal work that did not require Mark Adams' attention and expertise was done by Andrew Adams due to his lower billing rate. And any work that could be done by staff instead of the attorneys was handled by staff. But as the case file on this matter will show – nothing is done simply in this matter. Even uncontroversial matters like paying the State Court's crystal clear fee order become opportunities for game-playing, and thus at least the junior attorney must involve himself in those matters.

### D. TOTAL AMOUNTS ARE REASONABLE

The spreadsheet in **Exhibit 17 and 18** breaks down the total monthly fees for each employee so that the Court can review it for reasonableness. By far the most expensive month was March 2018, with the billing reflected in the April 2018 numbers. That $26,231 was unusually high in part because that month required Mark Adams' attention and work to the tune of $10,150. Much of this was preparation for and attendance at hearings setting up the trial on the appointment of a Chapter 11 Trustee.

Along those lines, only twice has any CRG staff member attended a hearing in person. Once was the Mark Adams appearance mentioned above. Second was an April 11, 2018 hearing that Andrew Adams attended in person, in part to try and discuss in person with Debtor's counsel the ongoing issues. Of course, Debtor's counsel did not show up in person that day.

As shown by the spreadsheet and the invoices, the most recent hours are almost always billed by Hayden Adams, a new lawyer working as an independent contractor based on his bankruptcy experience and skill. Mark Adams, with his higher billing rate, is not performing the time-intensive tasks such as drafting pleadings or reviewing audio files. The bulk of the work is done at much lower rates by Hayden Adams and Andrew Adams. From those billing records, the Court can see that support staff almost never works on this case – with the exception being this current motion and preparation of documents for the demands that Debtor made (after previously withdrawing them).

CRG has not played a primary role or been as involved as the City in this bankruptcy action, and the billing records and amounts owed all reflect that. CRG has had to engage in this matter, mostly from afar, to protect its own Claim based on the State Court's February 21, 2017 Order and to ensure that the buildings that were being liquidated at the outset of this matter did not in fact get liquidated and endanger CRG's Claim. Whether those buildings will be liquidated remains to be seen, but certainly based on the legal authority supporting CRG's Claim, the state court's previous approvals of the same exact type of claims, and the reasonable nature of the amount being requested in this present Motion, this Court should approve payment of the entire amount requested.

### E. PUBLIC POLICY REQUIRES THAT DEBTORS PAY THE FULL AMOUNT

It bears noting again that much of this work done by CRG was necessitated by Debtors' incessant efforts to deny the existence and validity of the debt they owe. They not only fail to pay the amount awarded by the State Court, they go so far as to blatantly lie to this Court about the existence of the State Court's fee order. The only possible explanation is that they are attempting to use this bankruptcy proceeding as a means to escape the State Court's Order. Such an abuse of the legal system must not be permitted as a matter of public policy.

When reviewing these invoices and the amounts summarized, the Court should ask itself what else could have been done? What time billed was wasted or not necessary? If CRG only

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

attended two hearings in person, and called into all others (even calling into the two day trial for the appointment of a Chapter 11 Trustee), then it is hard to imagine what time spent is alleged to be wasted or unnecessary. But with this Response and the attached information, the parties and the Court certainly have the records and detail to review. Adams and CRG put these time records forward with the expectation that they will be scrutinized, and expect that they will stand up to that scrutiny.

## VII.  <u>CONCLUSION</u>

Thus, for the reasons laid out above, and detailed in the attached Declaration and exhibits, this Court should approve the full Claim offered by CRG to be paid out of the first sale.


Dated: May 24, 2018         /s/ Andrew Adams

California Receivership Group

Case: 17-10828   Doc# 286   Filed: 05/25/18   Entered: 05/25/18 15:24:02   Page 24 of 34

MARK S. ADAMS AND CRG'S RESPONSE TO DEBTORS' CLAIM OBJECTION

MARK S. ADAMS, SB#68300
ANDREW F. ADAMS, SB#275109
California Receivership Group
2716 Ocean Park Boulevard, Suite 3010
Santa Monica, CA 90405
Tel.: (310) 471-8181
Fax: (310) 471-8180
madams@calreceivers.com
Court-Appointed Receiver

## IN THE UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SANTA ROSA DIVISION

| | |
|---|---|
| IN RE: | Case No: 17-10828 WJL |
| | Chapter 11 |
| FLOYD E. SQUIRES, III and BETTY J. SQUIRES, | **DECLARATION OF MARK ADAMS IN SUPPORT OF CALIFORNIA RECEIVERSHIP GROUP'S RESPONSE TO DEBTORS' CLAIM OBJECTION** |
| Debtors. | |
| | Hearing:<br>Date: June 27, 2018<br>Time: 10:30 a.m.<br>Courtroom 220, Oakland |
| | Hon. William J. Lafferty |

I, MARK ADAMS, declare as follows:

1.      The following is true and correct to the best of my knowledge.  If called upon to do so, I could and would testify competently thereto in a court of law.

2.      On May 4, 2018, Debtors Floyd Squires III, Betty J. Squires (Respondents in the State Court action) filed their Objection to Claim #57 that my office California Receivership Group ("CRG") filed. Their Objection is attached as **Exhibit 1**. I was the court-appointed Health and Safety Code Receiver for twenty-six properties ("Properties"), then six of those, all owned

1

DECLARATION OF MARK ADAMS

by the Debtors Floyd and Betty Squires in Eureka, California in the matter *City of Eureka v. Floyd Squires et al.,* Case #DR110040. I was appointed on March 10, 2011, and a true and correct copy of the Appointment Order is attached as **Exhibit 2**. A list of the Properties is below:

a. 609 Summer St. (APN 001-042-012)

b. 119 W. 6th St.; 607 Summer St. (APN 001-042-013)

c. 202 3rd St.; 315 C St. (APN 001-066-001)

d. 216 3rd St. (APN 001-066-002)

e. 205 4th St.; 317 C St.; 325 C St. (APN 001-066-007)

f. 117-119 5th St. (APN 001-071-004)

g. 211-219 5th St. (APN 001-103-004)

h. 1637 3rd St. (APN 002-063-005)

i. 2325 2nd St. (APN 002-123-004)

j. 1410 Union St. (APN 004-033-003)

k. 1233 A St. (APN 004-112-008)

l. 241 Wabash Ave. (APN 004-196-007)

m. 1803 C St. (APN 004-203-001)

n. 833 H St (APN 005-012-005)

o. 705 15th St. (APN 005-042-008)

p. 1623 G St.; 1625 G St. (APN 005-053-006)

q. 1635 G St. (APN 005-053-007)

r. 1925 H St. (APN 005-075-009)

s. 1429 Sunny Ave. (APN 006-191-015)

t. 2245 Broadway (APN 008-011-007)

u. 2235 Broadway (APN 008-011-010)

v. 204 W. Hawthorne St. (APN 009-122-005)

w. 2941 California St.; 2969 California St. (APN 010-061-010)

2

DECLARATION OF MARK ADAMS

x.   2927 California St. (APN 010-061-011)

y.   2535 L St. (APN 011-153-005)

z.   2445 Russ St. (APN 013-171-010).

3.      The City of Eureka ("The City") petitioned for my appointment due to the perpetually substandard and unsafe conditions. On January 18, 2011, the City filed a complaint with various allegations, and requested the emergency appointment of a receiver. That Application requested that the Court appoint me, Mark S. Adams, as receiver under Health and Safety Code §17980.7(c). The Court denied the request on February 3, 2011, and then held a hearing on February 28, 2011 on the same issue.

4.      The Properties that Debtors were leasing to the general public and collecting rent on were unsafe, and the Superior Court made formal findings twice on those nuisance conditions. After my appointment on March 10, 2011, I proceeded to follow the directions of the appointing State Court to inspect the properties and assess what work was necessary to abate the health and safety code violations and develop a rehabilitation plan.

5.      The Debtors fought me at every step of the way, immediately showing outright hostility and bad faith. Initially, the March 10, 2011 Appointment Order was stayed on appeal, then on October 24, 2011 a more limited Appointment Order was issued, this time over six of the original twenty-six properties that were thought to constitute the most substantial endangerment to the tenants and the surrounding community. This Order, which is attached as **Exhibit 3**, was also stayed on appeal.

6.      As the City informed the appointing State Court, when it initially petitioned for a Receiver back in 2011, the Debtors have a history of using retaliatory tactics against those that have sought to expose the lack of habitability of their Properties and their failure to make the necessary repairs. I am no stranger to their ire as, on October 19, 2011, the Debtors served and filed a Summons and Complaint in the Humboldt County Superior Court against me, the General Counsel of my organization, Andrew Adams, and California Receivership Group for various tort

Case: 17-10828    Doc# 286    Filed: 05/25/18    Entered: 05/25/18 15:24:02    Page 27 of 34

claims, including trespass and invasion of privacy ("Complaint").

7. The Complaint arose after I had dispatched Andrew Adams from my office to begin discussions with tenants and to inform them and surrounding neighbors of the Ruling to Appoint a Receiver, and he did so on October 5 and 6, 2011. Debtors and State Court Respondents Floyd Squires III, Betty J. Squires, along with five of their tenants, filed a complaint alleging trespass and Intentional Invasion of Privacy against me, Andrew Adams, and CRG LLC on October 19, 2011, fourteen days after the supposed trespass took place, and the same day that Debtors filed an Objection to my appointment as the Receiver. The second Order appointing me as Receiver was eventually signed October 24, 2011.

8. Debtors' Complaint was put before a jury at trial in July 2016 and the jurors found for my organization and I on all claims. Nevertheless, we have outstanding fees and costs from this litigation which thus far, the Debtors have declined to pay. Even after the appointing Judge, Hon. Dale Reinholtsen, issued the Order directing that they pay the amount of $158,107.36, a copy of that Order is attached as **Exhibit 4**.

9. I requested the payment of fees multiple times in State Court before a September 4, 2012 Tentative Ruling granted the fees incurred during the two appointments. Yet, the Tentative also denied without prejudice all other fees, asking that they be reviewed after the trial in Debtors' Complaint was completed.

10. On June 19, 2013, I submitted a Third Report, requesting that the State Court consider the equities, and award at least some of the over $80,000 of fees and costs then owed. That Report stated "I am a professional receiver without a personal interest in the matters surrounding this litigation. I ask that I be paid for the time I've billed and money I've advanced to this case in reliance on the Court's previous orders."

11. On September 13, 2013, the State Court issued a Ruling denying the request for fees, except for the fees and costs incurred during the two periods in between the appointment order and the entry of the undertaking staying those orders. The defense fees were denied

4

DECLARATION OF MARK ADAMS

without prejudice specifically to allow for the tort trial to proceed. On the same day, after I withdrew my name from consideration due to the ongoing lawsuit against me, the State Court appointed a new receiver, Jeffrey Smith ("Smith"). Smith was given the same direction as I, to inspect the Properties and submit a report on the conditions found. Following this, despite the substantial amount of fees owed to my office from our work on this case, there was a period where we were not served with the pleadings, and not able to keep abreast of new developments until we petitioned the State Court to include us in the service. Once the matter was completed, I planned to return to the Court to recover these fees. At this time, I was still expending resources on defending myself against the trespass claims in the Debtors' Complaint against myself and my office.

12. On January 9, 2014, Judge Dale A. Reinholtsen issued an Order following the September 13, 2013 Ruling, finding that Floyd Squires, Floyd E. Squires III, Betty J. Squires, FB Squires Family Trust, and Betty J's Building, Inc. were jointly and severally liable for the $15,317 in then-awarded fees and costs to the Receiver. The Order also authorized Adams to issue a super-priority Receiver's Certificate in that amount, to be secured by a deed of trust on all 26 properties. Attached as **Exhibit 9** is the January 21, 2014 Receiver's Certificate No. 1 and as **Exhibit 10** the January 21, 2014 Deed of Trust. Both documents were recorded in Humboldt County on January 23, 2014 by my office as a method of recuperating our fees and costs.

13. Debtors filed a February 21, 2014 Motion for Reconsideration in State Court, which was heard on March 3, 2014 and denied on September 8, 2014.

14. On June 19, 2014, I filed an Application requesting that the State Court authorize my office to hire trial counsel to defend our work as the Receiver under California Rules of Court 3.1180. On September 8, 2014, the Court denied without prejudice the request, so as to let the trial proceed and come to a result before authorizing counsel or approving the payment.

15. Following the jury trial in the Debtors' Complaint against myself and my office, we filed an August 10, 2016 Motion for Interim Fee Order ("Motion") (attached as **Exhibit 11**)

in the receivership case requesting $223,715.39 in fees and costs incurred both from my duties as receiver, and for our legal fees defending against the rejected claims that went to trial. At the time of the Motion, the fees and costs were calculated from the March 10, 2011 Appointment Order through to July 31, 2016. The Debtors filed an Opposition to our Motion on September 6, 2016 (attached as **Exhibit 12**) where they took issue with pre-receivership work and argued that my office was not entitled to legal fees incurred in defending the Complaint that they filed against us, even though we were the Court-Appointed Receiver during the time that the alleged wrongdoing occurred, and despite the fact that a jury had found that we had not actually done anything wrong. We then filed a Reply to their Opposition on September 9, 2016 (attached as **Exhibit 13**) where we argued that pre-appointment time and costs are quite common and that our defense costs have to be paid.

16.     The hearing was held on September 9, 2016, and on February 21, 2017, the Superior Court issued an Order authorizing $158,107.36 in fees and costs (attached as **Exhibit 4**). The total approved removed all pre-appointment fees and costs, and approved a limited portion of the $223,715.39 that was owed. This amount, along with the interest accrued through the claim date, is the secured debt referenced in Claim #57 in this Bankruptcy case. My office issued a Receiver's Certificate No. 2 to reflect the increased amount, a copy of which is attached as **Exhibit 6**, and amended the Deed of Trust (attached as **Exhibit 7**). Both the Deed of Trust and Amendment to Deed of Trust issued by my office and recorded in Humboldt County incorporated by reference an October 17, 1961 Fictitious Deed of Trust attached as **Exhibit 8**.

17.     Despite numerous attempts by my office to collect these fees and costs, the Debtors have made no effort to pay us. My office utilized multiple collection efforts to no avail; including letters requesting payment, Abstracts of Judgment, the Receiver's Certificates recorded per the terms of the January 9, 2014 Order and the February 21, 2017 Order. On July 28, 2017, we even filed a Motion requesting the appointment of a receiver to collect on our debt, which was denied by the Superior Court on November 15, 2017. Additionally, we attempted a

foreclosure sale on the Receiver's Certificate and Deed of Trust, which was set for November 27, 2017 (attached as **Exhibit 5**). Yet, the Bankruptcy Petition filed in this Court on November 8, 2017, which commenced the current matter, ultimately halted our foreclosure and other collection efforts. Thus, we bring our case to this Court and pray for relief.

18. After the July 31, 2016 cut-off date for fees that were included in that August 10, 2016 Motion, there have been substantial fees incurred. The total amount owed as of May 18, 2018 is $162,169. That is broken up into two separate categories – the work done in the state court, prior to the Petition being filed, and work done in this matter.

19. All told, there is $63,738.50 for fees incurred from August 1, 2016 - October 31, 2017 for the State Court Action. Those totals are summarized in the Excel spreadsheet printouts attached as **Exhibits 17 and 18**. These spreadsheets break down the fees incurred by employee both by year and by month. Attached as **Exhibit 19** is a true and correct copy of my office's rate sheet showing each employee's current billing rate. For all invoices prior to the filing of this bankruptcy Petition, CRG billed $63,738.50. That was time spent on collections, including the motion to appoint a receiver, and the attempted foreclosure. Again, no effort was made to pay the fees listed in the February 21, 2017 Order, and so it had to be actively enforced.

20. For all time spent in this matter, from November 1, 2017 - May 18, 2018, there is another $98,430.50 owed. As can be seen in the attached Excel printout in **Exhibits 17 and 18**, work billed in that time period was substantial. The month with the least billing, February 2018 (listed as the "Mar 18" billing) was $10,966.50 – which was higher than the most billed for any of the state court work during a one month period. The bulk of this work was preparing multiple filings to defend the validity and existence of the state court Order and the Certificate it authorizes. I made one appearance in person in Oakland, and Andrew Adams from my office also only made one in person appearance. Both of those personal appearances were made in the interest of discussing with the parties and attempting to resolve the matter, although neither was productive.

DECLARATION OF MARK ADAMS

21.     Having directed all of the work from CRG on this matter, I can state unequivocally that I know that active participation in this matter was necessary from the outset. Having had to defend a lawsuit in State Court, which went to a jury trial (a fact that is almost unbelievable to me, and something that has never happened in my 18+ years of acting as a receiver in over 190 different cases), It is clear to me that Debtors would do anything to avoid paying the Judgment issued against them.

22.     In my experience as a court-appointed agent, I realize that I often step into contentious and highly-charged matters. As Receivership is an extreme remedy to abating health and safety code violations, if there was any other option then I would not be have been involved or appointed. So I am used to dealing with aggressive or angry owners. But Floyd Squires is the most aggressive and unscrupulous property owner I have ever come across in my time as a Receiver. I have dealt with Wall Street firms that refuse to fix habitability problems, so long as the tenants are paying rent. I have seen rat bites on children due to a property owner's negligence, and leaking sewage underneath apartment buildings. Yet, Floyd Squires is the worst slumlord I have dealt with in my career, and likely the most stubborn and aggressive property owner.

23.     I say this not to reaffirm that Squires is a slumlord, because even many of the local news outlets freely refer to him that way. I say it because it contextualizes why the steadfast defense of the Order and Receiver's Certificate was necessary. Without that defense, and most notably calling out every time Debtors attempted to denigrate or call into question the validity of that Order/Certificate, then Debtors would have presented a wholly different story than was presented. I know that the loud and steadfast defense of my interest in the bankruptcy estate was necessary because I saw the repeated challenges that Debtor made to that claim.

24.     Attached to this Declaration are copies of our fees and costs from after those claimed in our August 10, 2016 Motion for Interim Fee Order ("Motion"), which were granted in the February 21, 2017 Order. In our Motion we claimed fees and costs from our initial

Appointment in March 2011 through to July 31, 2016. As the prior Motion occurred over a year and a half ago, it did not consider the costs we incurred in our efforts to collect on the succeeding judgment and the fees we've had to advance for our work to represent our claim as a Creditor in this Bankruptcy case. Attached as **Exhibit 14** are copies of our invoices from September through December 2016. Attached as **Exhibit 15** are copies of our invoices from January through December 2017. Attached as **Exhibit 16** are our invoices from January through May 8, 2018. Additionally, to assist with the Court's review of our fees and costs we have provided the following spreadsheets that show the fees and costs for each employee from the entire time period documented in our invoices from September 2016 to May 2018. **Exhibit 17** shows each employee's time by month and **Exhibit 18** shows each employee's time by year.

25. I am familiar with the receivership fees and costs in similar receiverships and associated bankruptcies. In my experience, the $350/hour billed for this work is well below the market rates, and reflects the 2011 rates. Those have risen since 2011. The $200-330/hour for Andrew Adams is well below the standard hourly rate for an attorney with over eight years of experience.

26. I have reviewed the attached billings and am familiar with the work described therein. All work billed by CRG was necessary for the receivership, then collection of that Order.

27. I am familiar with the work undertaken and know that the time spent, and projects worked on were necessary to this receivership and defense of the Receivership Certificate. I have reviewed the attached billings and am familiar with the work described therein. All work billed by CRG was necessary to collect on, and protect CRG's claim. I am also familiar with the billing rates of the attorneys and staff involved and know them to be reasonable billing rates.

28. All work undertaken that is addressed in this Response, this Declaration, and the attached Exhibits was done at the cheapest possible billing rate. Where possible, projects were delegated to non-legal staff, and all legal work was done by the cheapest possible attorney. Reviewing the individual invoices shows that.

Case: 17-10828    Doc# 286    Filed: 05/25/18    Entered: 05/25/18 15:24:02    Page 33 of 34

29.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 25th day of May 2018, at Santa Monica, California.

/s/ Mark Adams_____
Mark Adams

Case: 17-10828    Doc# 286    Filed: 05/25/18    Entered: 05/25/18 15:24:02    Page 34 of
34